# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| REGINA JENKINS, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 15-CV-08415 |
| CHICAGO TRANSIT AUTHORITY | ) ) | Judge John J. Tharp, Jr. |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Regina Jenkins arrived for her first day of work for the Chicago Transit Authority ("CTA") wearing a boot as a result of a fractured foot. As Jenkins tells it, after only a couple days of training, the CTA demanded that Jenkins turn in her badge and resign, claiming she could not do the job for which she had been hired. When Jenkins attempted to explain the situation and provide a doctor's note, the CTA threatened that she would be ineligible for rehire if she did not resign. Jenkins refused to resign and was terminated (and possibly placed on a do not hire list). Jenkins then sued under the Americans with Disabilities Act ("ADA") for discrimination, failure to accommodate, and retaliation. The CTA has moved to dismiss. For the reasons stated below, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

On a motion to dismiss, the Court accepts all facts alleged in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015). *Pro se* complaints, such as the one here, are held to less stringent standards and read liberally. *Id*. The Court also considers the facts alleged in Ms. Jenkins's response as long as they are consistent with the allegations of her operative complaint. *Id*. at 311 ("We have held that facts alleged by a plaintiff in a brief in opposition to a motion to dismiss may be considered

when evaluating the sufficiency of a complaint so long as they are consistent of the allegations in the complaint."). If a *pro se* plaintiff files a document seemingly in response to a motion to dismiss, that document's contents can be considered even if it is not labeled as a response to the motion or does not conform to the usual expectations of such a response. *Id*.

Plaintiff Regina Jenkins filed suit against her former employer, the Chicago Transit Authority ("CTA"), alleging they had terminated her, failed to reasonably accommodate her disability, and retaliated against her for attempting to protect her rights under the Americans with Disabilities Act ("ADA"). *See* Second Am. Compl. ("Compl.") at 4,[1] ECF No. 20. She filed her lawsuit on September 24, 2015, only a few months after the events in the complaint took place. In response to previous motions to dismiss, she has amended her complaint several times.

Jenkins was hired by the CTA as a Customer Service Assistant, scheduled to start her training on May 11, 2015. *See id*. at 7. Unfortunately, Jenkins injured her right foot on May 3, 2015, after she had been hired but before she was scheduled to begin working for the CTA. *Id*. Jenkins did not have health insurance, so she used a CAM ("controlled ankle movement") boot to immobilize her foot and prevent further injury. *Id*. She arrived for work as planned on May 11, was given a badge, and took part in the regular orientation activities. *Id*.

On May 12, Jenkins began classroom training for her new job. Compl. at 7. One of her instructors asked her about the boot, and she responded that she had injured her foot at home and was "not totally sure about the injury." *Id*. The instructor told her to take her seat, but she was later pulled out of class by another instructor and spoke with a CTA supervisor. *Id*. She again informed them her injury had taken place at home, and was allowed to return to training. *Id*. At

---

[1] Jenkins's *pro se* complaint was filed using a standardized form and attached narrative, which does not number the paragraphs of her complaint. Therefore, the Court uses page numbers rather than paragraph numbers to reference parts of her complaint.

the end of that day, she was told to report for class again the next day. *Id*. When she arrived home, however, she picked up a voicemail message telling her that she could not return to training until she provided a doctor's statement explaining her injuries. *Id*. She was also told if she missed too many days of training, she would be placed in the next training class. *Id.*

On May 13 (the day after the voicemail), a CTA administrator named Kyleen Giagnoni called to set up an appointment for Jenkins to turn in her badge. Compl. at 7. Jenkins relayed the previous day's conversation, but Giagnoni said Jenkins could not do the job for which she had been hired and reiterated that she needed to come in to "sign some papers and hand in [her] badge." *Id*. at 8. Jenkins believed the CTA was firing her because of her injured foot. *Id*.

On May 15, Jenkins went to a doctor and received a note stating that she had fractured her right foot and had "limited walking" and needed to continue wearing the CAM boot. Compl. at 10. However, it is not clear that the CTA was ever given the doctor's note they had originally requested. The following Monday, May 18, Jenkins met with Giagnoni as requested and turned in her badge. *Id*. at 8. After she did so, she asked for permission to speak and stated that she thought Giagnoni was "misinformed" and tried to explain the situation with her foot. *Id*.

Giagnoni left and returned with Kathleen Doyle, the Senior Director of Human Resources, as a witness. *Id*. Jenkins again explained "the situation" and stated that she had procured as doctor's statement as requested. *Id*. Neither Giagnoni nor Doyle asked to review the doctor's note. *Id*. Giagnoni then reiterated that Jenkins could not do the job for which she had been hired, and that she needed to sign resignation papers. Compl. at 8. Jenkins refused to sign the resignation papers, and Doyle told her that if she did not sign the resignation papers, Jenkins would be considered "AWOL" and would not be able to work for the CTA in the future. *Id*. Doyle gave Jenkins the forms and ended the meeting. *Id*.

The next day, Jenkins called Doyle and left a message, but Doyle did not return her call. *Id*. The day after that, Jenkins and her father (a retired CTA employee) went to the CTA's main office to try to get a meeting with someone with "more authority in the situation." Compl. at 8. Jenkins asked to speak with Doyle or her superior. *Id*. Jenkins was allowed to meet with Doyle, and reiterated her desire to work for the CTA. *Id.* at 9. When Doyle was apparently not receptive to Jenkins continuing to work at the CTA, Jenkins requested to speak with Doyle's supervisor. *Id*.

Omar Brown, the Vice President of Human Resources, and Debra Jackson, another Human Resources employee, then joined the meeting. *Id*. Jackson, who had also been in Jenkins's training class, confirmed Jenkins had worn the boot during her first day. *Id*. Jenkins explained the situation with her boot and reiterated her desire to work for the CTA. *Id*. Jenkins then requested that she be transferred temporarily to another department, which Brown refused. *Id*. Jenkins then asked if her employment could be "put on hold" while her injury healed. *Id*. Brown refused, stating "[w]e don't have a place to put you." *Id*. Jenkins countered that CTA drivers whose licenses are suspending are reassigned to another area, to which Brown reiterated there was no holding space or place in which to put her. *Id*.

Jenkins again reiterated that she would not resign and that she wanted to work for the CTA. Compl. at 9. Jackson then told her "[y]ou are no longer an employee here" and Jenkins was never contacted again by the CTA regarding her employment. *Id*. After "vigorous attempts" over several months, Jenkins did receive a paycheck for her time in training. *Id*. Jenkins filed an EEOC charge on June 19, 2015 and received her right to sue letter on June 24, 2015. *Id*. at 11-12.

**DISCUSSION**

The CTA has moved to dismiss Jenkins's complaint for a number of reasons. Jenkins, apparently confused by this Court's orders that she respond to the motion to dismiss,[2] filed another amended complaint in lieu of a response with the help of the Court's *pro se* assistance program. The CTA argues that Jenkins's failure to respond with substantive law should doom her complaint. *See Lekas v. Briley*, 405 F.3d 602, 614-15 (7th Cir. 2005). This is not a case, however, in which a plaintiff files nothing in response to a motion to dismiss. *Compare Gallagher v. Dursun*, No. 13 C 7891, 2015 WL 1051445, at *1 (N.D. Ill. Mar. 6, 2015), *aff'd in part, vacated in part, remanded sub nom. Gallagher v. O'Connor*, No. 16-1594, 2016 WL 6427270 (7th Cir. Oct. 31, 2016) ("a plaintiff's failure to respond to a Rule 12(b)(6) motion giving plausible reasons for dismissal provides adequate grounds for granting the motion"). Jenkins attempted to oppose the motion and did so with the assistance of the Court's own *pro se* assistance desk. Although legal argument would have been useful to the Court, failure to respond as a lawyer would does not automatically warrant dismissal of her case. Therefore, the Court instead addresses the CTA's motion to dismiss on its merits.

In evaluating these claims, the Court bears in mind that a complaint must only plead enough facts to "raise a right to relief above the speculative level." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013). Furthermore, *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers." *Frazier v. Varga*, 843 F.3d 258, 262 (7th

---

[2] During the presentment hearing on the motion to dismiss, Jenkins was plainly confused by the distinction between responding to a motion to dismiss and filing an amended complaint. Over the course of several exchanges, the Court believed it had explained the difference adequately, but Jenkins's response suggests that further explanation was required.

Cir. 2016). A plaintiff "need not plead legal theories" – the facts are what matter at this stage of the litigation. *Ortiz v. Downey*, 561 F.3d 664, 670 (7th Cir. 2009).

**I. Racial Discrimination**

The boilerplate of the complaint form Jenkins used automatically adds a claim for discrimination on the basis of race, color, or national origin against all governmental entities. *See* Compl. at 4, ¶ 10. This appears to be an error in the complaint form, since Jenkins has alleged literally no facts suggesting she was discriminated against in any way based on race, color, or national origin. In fact, in the portion where Jenkins indicated the basis for the discrimination, she checked only "disability" when "color," "race," and "national origin" boxes were available. *See id.* at 3-4. A plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court honestly doubts that Jenkins had any intention of pleading a racial discrimination claim under 42 U.S.C. § 1983. To the extent that she intended to do so, Jenkins has failed to plead any facts suggesting her race, color, or national origin had anything to do with the events that took place. Therefore, the CTA's motion to dismiss is granted as to any § 1983 race, color, or national origin claim.

**II. Punitive Damages**

Jenkins also checked a box requesting "appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgement interest, and costs, including reasonable attorney fees and expert witness fees" if such remedies were available. As the CTA correctly points out, the ADA (through its incorporation of a section of Title VII) does not allow for punitive damages against a government agency such as the CTA. *See* 42 U.S.C. § 1981a(b)(1); *Barnes v. Gorman*, 536 U.S.

181, 189 (2002). Therefore, the CTA's motion to dismiss is granted as to any claim for punitive damages.

### III. Retaliation Claim

The ADA explicitly prohibits retaliation against any individual "because such individual as opposed any act or practice made unlawful by this Act." 42 U.S.C. § 12203(a). To establish a retaliation claim, Jenkins must show that she engaged in a protected activity, suffered an adverse action, and that the activity caused the adverse action. *Dickerson v. Bd. of Trs.*, 657 F.3d 595, 601 (7th Cir. 2011). The CTA's two-paragraph section on the retaliation claim argues that Jenkins did not engage in protected activity or demonstrate causation. The CTA appears to agree that her termination or placement on a "Not Eligible for Rehire List" would constitute an adverse employment action. *See* Def.'s Mem. at 7.

Jenkins has plausibly pleaded that she engaged in protected activity when she refused to sign the resignation papers. Recall that Jenkins was originally told that she would be placed in the next upcoming training class if she did not get her doctor's paperwork together quickly enough. Compl. at 7. Next, she was told she needed to turn in her badge and "sign some papers." *Id*. at 8. At the meeting where Jenkins turned in her badge, she repeatedly attempted to explain her situation and stated that she believed Giagnoni was "misinformed" and that she had a doctor's note. *Id*. One reasonable inference to draw from this series of events is that Jenkins felt she was being wrongly forced to resign because of her medical problem. When she refused to resign, Jenkins was threatened with the prospect of being ineligible for rehire if she did not sign within a few days. *Id*. During the May 20 meeting (two days later), Jenkins repeatedly reiterated that she wanted to work and requested a number of accommodations until her injury healed. *Id*.

at 9. She again refused to resign, and was told that she was "no longer an employee here." *Id*. at 9.

Jenkins's refusal to sign, drawing the inferences in her favor, communicated that she was opposing an act that she believed discriminated against her on the basis of her injury. *Compare Finlay v. Beam Glob. Spirits & Wine, Inc.,* No. CIV.A. 10 C 5622, 2012 WL 1952642, at *3 (N.D. Ill. May 30, 2012) (refusal to sign witness statement not protected activity where plaintiff offered other reasons for refusing to sign that had nothing to do with discrimination). Jenkins told the CTA that she had a doctor's note, that the CTA was misinformed, and that she could work. All of this suggests that she believed the CTA's action to be wrongful, if not illegal. The Court further notes that the CTA need not have actually violated the ADA for the retaliation claim to move forward. *See Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1096 (7th Cir. 1998).

Causation may be pled through "circumstantial evidence that would permit an inference of retaliation absent an employer's admission." *Vega v. Chi. Park Dist.*, 958 F. Supp. 2d 943, 955 (N.D. Ill. 2013). Jenkins "must only plead facts to create an inference of a plausible claim" to get past the motion to dismiss. *Id*. Here, Jenkins was explicitly told she would be prevented from ever working for the CTA again if she did not sign the resignation papers. Furthermore, the CTA's abrupt about-face (from desiring a doctor's note and, at worst, placing her in the next training class to firing her and preventing her from becoming re-employed) creates suspicious timing that suggests Jenkins's refusal may have caused the CTA to take harsher action against her. Thus, the Court finds that Jenkins has stated a plausible retaliation claim and the motion to dismiss the retaliation claim is denied.

**IV. Disability Discrimination and Failure to Accommodate**

The CTA argues that Jenkins has not demonstrated that she is a qualified individual under the ADA, and therefore she cannot sustain her discrimination and failure to accommodate claims. *See* Def.'s Mem. at 4. In a typical case, a person invoking the ADA must show that "(1) she is disabled; (2) she is able to perform the essential functions of the job either with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." *Majors v. GE*, 714 F.3d 527, 533 (7th Cir. 2013). The CTA targets the first two elements.

A person is disabled under the ADA when she either has "a physical or mental impairment that substantially limits one or more major life activities" or is "regarded as having such an impairment." 42 U.S.C. § 12102(1). The statute defines "major life activities" to include "walking" and "working." *Id.* at § 12102(2)(A). Furthermore, the statute specifically states that the "definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act." *Id.* at § 12102(4)(A). The term "substantially limits" is similarly "not meant to be a demanding standard." *Maxwell v. Cty. of Cook*, No. 10 CV 00320, 2014 WL 3859981, at *3 (N.D. Ill. Aug. 4, 2014). The CTA acknowledges that Jenkins identified that her walking was limited due to her fractured foot, but argues that Jenkins has failed to sufficiently plead how long her walking was limited or to what extent. As to the former argument, the Court notes that this case was filed mere months after Jenkins broke her foot, so information about how long her walking was (or is) limited may not have been available to her. As to the latter argument, Jenkins has provided a few facts that suggest to what extent her walking was limited: her foot was fractured, a doctor prescribed "limited" walking, and she was required to wear a CAM boot. Given the statute's directive to construe the definitions of its terms broadly to include

more individuals, these facts at least suggest a plausible claim that Jenkins's walking was substantially limited such that she would be considered disabled.

More importantly, if Jenkins was wrongly perceived as having a disability, that would also be sufficient to invoke the protection of the ADA. Jenkins has alleged plenty of facts that her CTA instructors saw (perceived) her boot and informed CTA administrators, who then told her that she could not do her job because of her injury. *See* Compl. at 7-8. A person who is wrongly regarded as having an impairment does not have to make any showing regarding a (real or perceived) substantial limitation of a major life activity. *See Steffen v. Donahoe*, 680 F.3d 738, 744 (7th Cir. 2012). Fundamentally, the CTA cannot have it both ways: either Jenkins in fact could not do her job because of her injury (in which case she was plausibly substantially limited from working and was entitled to a reasonable accommodation or at least an interactive process) or Jenkins was not disabled and could do her job (in which case the CTA's decision to fire her based on her perceived inability to do so violated the ADA).

Second, the CTA argues that Jenkins never alleged that she was able to perform her job with or without a reasonable accommodation. Jenkins's complaint, however, alleges that she was able to successfully perform everything that had been asked of her on the job: she had attended her orientation and was participating in training classes. *See* Compl. at 7. According to the complaint, during the May 20 meeting, Jenkins against expressed her desire to work for the CTA, and when she was told again that she could not do her job, she requested a transfer or that her employment be "put on hold" (perhaps by having her join the next training class, as the CTA had previously indicated might be an option). *Id*. at 9. Obviously Jenkins cannot plead detailed allegations of what her job duties would have consisted of once she got out of classroom training because she never got to that point in her employment. It is the CTA that knows exactly what the

essential functions of Jenkins's job are. However, the Court reads Jenkins's allegations to imply that she was performing her duties up to that point with the boot and no further need for accommodation. Furthermore, Jenkins's conversation implies that she proposed several accommodations that would allow her to remain with the CTA even if she could not do her assigned job.

Whether or not Jenkins in fact could do her job, whether her proposed accommodations were in fact reasonable, the extent of the limits on her walking, and even the amount of time her walking was limited are fact issues that go beyond the scope of the pleadings. *See Martinez v. Bitzer Prod. Co.*, No. 11 C 6811, 2012 WL 1409537, at *2 (N.D. Ill. Apr. 23, 2012) ("Whether these duties are considered essential functions of Martinez's job, and whether or not he could perform essential duties with or without reasonable accommodation requires a factual inquiry into the demands of his job and the nature of his disability that is beyond the scope of the pleadings."). The Court does not mean to suggest that Jenkins has proven a claim as to either discrimination or failure to accommodate.[3] Discovery is needed to reveal many facts about the responsibilities of Jenkins's job, her disability, and the reasonableness of any accommodations. Therefore, the motion to dismiss is denied as to the discrimination and retaliation claims.

\*     \*     \*

Jenkins has adequately pled her claims that the CTA discriminated against her, failed to accommodate her, and retaliated against her. Therefore, the motion to dismiss is denied as to

---

[3] For example, if Jenkins in fact was only perceived as having a disability, the discrimination claim could go forward but not the failure to accommodate claim. *See Nehan v. Tootsie Roll Indus., Inc.*, 54 F. Supp. 3d 957, 973-74 (N.D. Ill. 2014). An employer cannot be required to accommodate a nonexistent disability. At this stage, however, a plaintiff can plead conflicting legal theories. *See Marks v. Compo Steel Prod., Inc.*, No. 08C5049, 2008 WL 5221172, at *4 (N.D. Ill. Dec. 12, 2008).

those claims. The motion to dismiss is granted as to any § 1983 race, color, or national origin discrimination claim, as well as to the claim for punitive damages.

Dated: August 17, 2017

John J. Tharp, Jr.

United States District Judge