**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| REGINA JENKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 C 08415 |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff in this case, Regina Jenkins, was briefly employed by defendant, the Chicago Transit Authority (CTA), but was terminated when complications arose relating to her fractured toe. Ms. Jenkins alleges disability discrimination and unlawful retaliation under the Americans with Disabilities Act (ADA) against CTA. The defendant has filed a motion for summary judgment. Because the undisputed record shows that CTA did not discriminate against Ms. Jenkins on the basis of her disability and did not retaliate against her for statutorily protected conduct, the defendant's motion for summary judgment is granted.

## BACKGROUND

### I.    Ms. Jenkins' Failure to Respond to the Motion for Summary Judgment

Ms. Jenkins has not responded to CTA's motion for summary judgment or its accompanying statement of facts. Although a failure to respond at this stage does not yield default judgment, *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006), it does have consequences. Namely, the facts material to the dispute are drawn from the moving party's

statement of facts. *Id.*

Under the Local Rules for the Northern District of Illinois, "a party filing a motion for summary judgment . . . must serve and file 'a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.'" *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) (quoting LR 56.1(a)(3)). A party opposing the motion must (1) file a response to each numbered paragraph in the movant's statement of material facts including, in the case of disagreement, a specific reference to the affidavits, parts of the record, or other supporting materials relied upon and (2) file its own statement, consisting of short, numbered paragraphs, of any additional facts that would require denial of summary judgment. LR 56.1(b)(3). If the opposing party's response "fails to dispute the facts set forth in the moving party's statement in the manner dictated by [Local Rule 56.1], those facts are deemed admitted for purposes of the motion" for summary judgment. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

Although the Court may look beyond the statement of facts and consider "other materials in the record" in assessing the motion for summary judgment, Fed. R. Civ. P. 56(c)(3), it is not obligated "to scour the record looking for factual disputes." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994); *see also Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000) (holding that the "district court is entitled to limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Rule 56.1] statements"). Except where otherwise noted, the Court uses CTA's "statement of material facts in determining whether summary judgment is proper, but still view[s] those facts in the light most favorable to [Ms. Jenkins]." *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006).

Ms. Jenkins' *pro se* status does not require a more flexible approach. *See Milton v. Slota*,

697 Fed. App'x 462, 464 (7th Cir. 2017) ("[T]he court was entitled to strictly enforce the local rule, even against a pro se litigant, by deeming uncontroverted statements of material fact admitted for purposes of deciding summary judgment."); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) (stating that "the Supreme Court has made clear that even *pro se* litigants must follow rules of civil procedure" in finding no abuse of discretion by district court that adopted defendants' statement of facts where *pro se* plaintiff failed to comply with Local Rule 56.1) (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)). Local Rule 56.2, however, does require that parties provide notice to *pro se* litigants opposing summary judgment. LR 56.2. CTA has done that here, ECF No. 93, and the Court finds it appropriate to follow the standards articulated above in view of Ms. Jenkins' complete failure to respond to CTA's motion.

## II.     Undisputed Facts

On April 13, 2015, Regina Jenkins accepted an offer of employment to serve as a Part-Time Temporary Customer Service Assistant (CSA) with the Chicago Transit Authority (CTA). Defendant's Statement of Facts ("DSOF") Ex. 3, ECF No. 92-2. She was scheduled to start on May 11, 2015, but eight days prior to her start date, on May 3, she injured her last toe ("pinkie" toe) on her right foot. *Id.* ¶¶ 4,13. Her symptoms were "swelling, throbbing, soreness, and a limp." *Id.* ¶ 22. To deal with the injury, Ms. Jenkins began wearing a controlled ankle movement, or "CAM," boot that she found at her home. *Id.* ¶ 14.[1]

Problems began on May 12, Jenkins' second day on the job, when she reported for Rail Safety Training wearing her CAM boot. DSOF ¶ 38. As Ms. Jenkins knew, the CSA position required a uniform and the CAM boot did not conform with the mandated footwear. *Id.* ¶¶ 37, 39.

---

[1] A CAM boot is a "medical boot that completely surrounds the foot and ankle and comes up the shin to lock the ankle in place." DSOF ¶ 21.

The footwear requirement—black shoes with non-slip soles of a specific width and structure—was not simply CTA's aesthetic preference, it was a matter of safety. *Id.* ¶ 9. Completion of the Rail Safety Training required navigating the area around the track: trainees had to walk across elevated ballasts that crossed over the energized third rail. *Id.* ¶¶ 40. As Ms. Jenkins was aware, falling on live voltage can lead to serious injury or even death, *Id.* ¶ 43, and she was unsure whether she would be able to balance on the boards in her CAM boot. *Id.* ¶ 25. Nonetheless, Ms. Jenkins wore the CAM boot because her foot was too swollen for the uniform-compliant shoes she had worn to earlier training sessions. *Id.* ¶ 46. As a rule, however, trainees in non-conforming footwear are not permitted to test on the rails. *Id.* ¶¶ 41, 42, 44. Accordingly, on May 12, Steven James, the Rail Instruction Manager, talked with Ms. Jenkins about her non-conforming footwear and asked her about the nature of her injury. *Id.* ¶ 35. When Jenkins responded that she did not know because she had not yet seen a doctor, James asked her to see a doctor to find out what her injury was. *Id.* ¶¶ 35-36. After her conversation with Mr. James, Ms. Jenkins did not attend the remainder of training. *Id.* ¶ 47.

On May 13, Kyleen Giagnoni, the "Coordinator, Administration Support of Rail Operations," called Ms. Jenkins and left a message asking Ms. Jenkins to return the call and make an appointment to turn in her badge. *Id.* ¶ 50. On the return call, Ms. Giagnoni made an offer: if Ms. Jenkins resigned, once she was out of the CAM boot and had a doctor's release, she could enter the next training session without having to reapply to be a CSA. *Id.* ¶¶ 50-51. On the same call, they made an appointment for a face-to-face meeting on May 18. *Id.* ¶ 50.

Prior to the scheduled meeting, on May 15, Ms. Jenkins visited Dr. Gregory Primus and was diagnosed with a fractured toe. *Id.* ¶ 15. Although Ms. Jenkins was capable of walking without the CAM boot, Dr. Primus advised Ms. Jenkins to limit her walking and wear the boot. *Id.* ¶¶ 20,

23. Injuries of this sort generally take six to eight weeks to heal, and Dr. Primus advised Ms. Jenkins to return in three weeks for re-evaluation. *Id.* ¶¶ 18-19.

On May 18, Ms. Jenkins attended the meeting with Ms. Giagnoni, but refused to sign the resignation papers. *Id.* ¶ 58. Although Ms. Giagnoni informed Ms. Jenkins that she had "a few days to think about her decision," Ms. Jenkins was administratively separated from CTA later that day. *Id.* ¶ 49. This followed from CTA policy: when, for whatever reason, a CSA is unable to complete Rail Safety Training, that employee is separated from the CTA. *Id.* ¶ 48. Although Ms. Jenkins' complaint alleges that she was told she would be placed on a "do not hire" list if she refused to resign, Ms. Giagnoni did not enter any rehire restrictions and Ms. Jenkins' HR Separation notification does not show any rehire restrictions. *Id.* ¶¶ 54-55.

Two days later, on May 20, Ms. Jenkins returned to the CTA office and, again, she refused to sign the resignation papers. *Id.* ¶ 52. This time, she requested various accommodations, including: that her job be put on hold until her injury healed; that she be placed in a different department (without specifying which department or role); that she be treated analogously to a CTA bus driver with a suspended license and put temporarily into another area. *Id.* ¶¶ 29-31. CTA did not grant these requests, however, and the administrative separation entered on May 18 remained in effect. Ms. Jenkins has not sought employment with CTA since the meeting on May 20, 2015.

Following these events, Ms. Jenkins did not return for a follow-up with Dr. Primus and she does not recall her symptoms lasting longer than the expected six to eight weeks. *Id.* ¶¶ 19, 18.

## DISCUSSION

Summary judgment is appropriate only if the defendant shows that there is "no genuine dispute as to any material fact and [that it is] entitled to judgment as a matter of law." *EEOC v.*

*CVS Pharmacy, Inc.*, 809 F.3d 335, 339 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the Court construes "all facts and makes all reasonable inferences in favor of the non-moving party." *Jajeh v. County of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). Nonetheless, to show that a material fact is disputed, the non-moving party "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The moving party "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993).

## I. Disability Discrimination

Ms. Jenkins claims that CTA's response to her fractured toe violated the ADA, which proscribes discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A plaintiff may show discrimination in either of two ways—"by presenting evidence of disparate treatment or by showing a failure to accommodate"—and Ms. Jenkins has alleged both. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). To claim protection under the ADA, Ms. Jenkins must first establish that she is a qualified individual with a disability. CTA does not expressly dispute, as a threshold matter,[2] whether Ms. Jenkins was a "qualified"

---

[2] By arguing that Ms. Jenkins did not identify any reasonable accommodations to substantiate her accommodation claim, however, CTA has, in effect, argued that Ms. Jenkins is not a "qualified individual." *See* 42 U.S.C § 12111(8) (A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."). Nonetheless, the Court chooses to address the argument in the context it was made. *See infra* notes 14-20 and accompanying text.

individual. Therefore, the Court begins with the question of whether Ms. Jenkins had a disability as defined by the ADA.

## A. Disability

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). With respect to the first subsection—having an impairment—the statute and associated regulations provide further definition of the two operative terms, "major life activities" and "substantially limits." First, the ADA provides a non-exhaustive list of major life activities that includes, among others, seeing, hearing, lifting, standing, walking, and working. 42 U.S.C. § 12102(2)(A). Second, EEOC regulations, which are "entitled to deference," *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 n.7 (7th Cir. 1998), state that "substantially limited" refers to the "condition, manner, or duration" of an individual's performance of or ability to perform the major life activity. 29 C.F.R. § 1630.2(j)(4). The regulations also clarify that a qualifying impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). This clarification is consistent with Congress' 2008 amendment to the ADA which instructed courts to construe the threshold terms "in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter." 42 U.S.C § 12102(4)(A).

CTA argues that Ms. Jenkins' fractured toe was not a disability, largely because it was a "run-of-the-mill short-term injur[y]." Def.'s Mem. at 5, ECF No. 91. As CTA acknowledges, limited duration is not a categorical bar to disabled status. *Id.* EEOC regulations state that impairments "lasting or expected to last fewer than six months can be substantially limiting" for the purposes of establishing disability. 29 C.F.R. § 1630.2(j)(1)(ix). The Appendix to the

regulations, however, provides that the length of the impairment is "one factor" in determining whether an individual is substantially limited and concludes that "[i]mpairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe." 29 C.F.R. Pt. 1630, App. According to the Appendix, "if an individual has a back impairment that results in a 20–pound lifting restriction that lasts for several months, he is substantially limited in the major life activity of lifting." *Id.* Courts assessing short-term injuries have employed this non-categorical approach, rendering largely fact-bound decisions.[3] *Compare Bob-Maunuel v. Chipotle Mexican Grill, Inc.*, 10 F. Supp. 3d 854, 881-82 (N.D. Ill. 2014) (finding that plaintiff's hernia, which required a ten-pound lifting restriction but was repairable through surgery, and plaintiff's eye disease, which initially prevented him from seeing out of one eye but ultimately "improved over the following months," were disabilities under the ADA), *and Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 333 (4th Cir. 2014) (finding a disability where plaintiff alleged "a severe injury that prevented him from walking for at least seven months"), *with Shaw v. Williams*, No. 16-CV-1065, 2018 WL 3740665, at *9 (N.D. Ill. Aug. 7, 2018) (collecting cases and finding that plaintiff's sprained ankle was not an ADA disability where "the entire period of Plaintiff's impairment lasted no more than six months, and for portions within that period, Plaintiff demonstrated significant improvement and increased mobility").

Even applying a liberal rule of construction and resolving ambiguity in Ms. Jenkins' favor, the facts of record do not provide sufficient evidence to find that Ms. Jenkins' fractured toe was

---

[3] Many decisions, including the majority of cases cited by CTA, continue to rely upon outdated versions of EEOC guidance. In particular, the statement that "non-chronic impairments of short duration with little or no long term or permanent impact" such as "broken limbs, sprained joints, concussions, appendicitis, and influenza" are "usually not disabilities" is from an out-of-date version of the Appendix to 29 C.F.R § 1630.2. 29 C.F.R. Pt. 1630, App. (effective until May 24, 2011).

an ADA disability. The evidence shows that her fractured toe healed in, at most, eight weeks, a shorter timeline than presented in the EEOC's example or at issue in *Bob-Maunuel*, *Summers*, or *Shaw*. Length is not dispositive, but EEOC guidance indicates that, to constitute a substantial limitation, severity must increase as duration decreases. In this case, both duration and severity are lacking. The first potentially impacted major life activity is "walking." The only support for a limitation is that Ms. Jenkins initially experienced "swelling" and a "limp" and that Dr. Primus instructed her to limit her walking. DSOF ¶¶ 22-23. But ultimately, she "was still able to walk, even without the CAM boot." *Id.* ¶ 23. As the plaintiff, it is Ms. Jenkins' obligation to put forth evidence of an impairment: it is not the Court's role to assume that Ms. Jenkins can prove facts not before it. Without more evidence chronicling the "condition, manner, or duration" of Ms. Jenkins' walking, a reasonable factfinder could not conclude that she was substantially—let alone severely—limited.

The second potentially impacted major life activity is "working." To invoke this category, it is not enough to show "substantial limitation in performing the unique aspects of a single specific job." 29 C.F.R. Pt. 1630, App. Rather, a plaintiff must show "that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities." *Id.* The class of jobs may be specified by the "nature of the work" (*e.g.*, "commercial truck driving," "assembly line jobs," or "clerical jobs") or by reference to "job related requirements" (*e.g.,* jobs requiring "repeated bending," "prolonged sitting or standing," or "extensive walking"). *Id.* Again, the evidence is too slim to find that Ms. Jenkins was substantially limited. Although the post-2008 Appendix counsels against "complex and onerous" evidentiary standards, *Id.* at n.3 (referencing a pre-Amendment case that found no limitation where plaintiff "did not present evidence of the

number and types of jobs available to him in the Washington area"), the factual record under review does not even specify a class of jobs that would be unavailable to Ms. Jenkins. CTA's statement of facts does reference a job-related requirement: Ms. Jenkins "believed she would have had difficulty stooping in the CAM boot." DSOF ¶ 12. As above, the limitation is brief—it presumably subsided in less than two months. Further, the factual record under review, which contains this lone subjective assessment, is too bare to support a finding of a substantial or severe limitation. Therefore, Ms. Jenkins' fractured toe does not qualify as a disability under the ADA.

Similarly, the evidence cannot support a finding that Ms. Jenkins had a record of disability (§ 12102(1)(B)) or was regarded as having a disability (§ 12102(1)(C)). An individual has a record of a disability if she has "a history of, or has been misclassified as having, a mental or physical impairment." 29 C.F.R § 1630.2(k). Here, Ms. Jenkins' fracture was a one-time, non-chronic injury. Because there is no evidence that she was classified as impaired in the past, she cannot have been misclassified. As a result, CTA could not have discriminated on that basis. *Id.* Subsection (C) is equally unavailing. The regulations specify a defense to discrimination alleged under the "regarded as" prong where the claim is based on a "transitory and minor" impairment. 29 C.F.R. § 1630.15. To establish the defense, CTA must demonstrate that the impairment was, objectively, both transitory and minor. The regulation defines transitory as "lasting or expected to last six months or less." *Id.* Here, Ms. Jenkins' injury was objectively transitory: the evidence indicates it healed in six to eight weeks. Although the regulation does not elaborate on "minor," the Court finds that the injury was objectively minor for the reasons articulated above—namely, that Ms. Jenkins "was still able to walk, even without the CAM boot." DSOF ¶ 23.

Finding that Ms. Jenkins was not disabled within the meaning of the ADA, of course, dooms her ADA discrimination claims. Nevertheless, the Court reviews the remaining elements of these claims, which provide additional grounds for dismissal.

## B. Disparate Treatment

To survive summary judgment on a disparate treatment claim, Ms. Jenkins must show that "a reasonable juror could conclude that [she] would have kept [her] job if [she] was not disabled, and everything else had remained the same." *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)).[4] Contrary to past practice, when assessing this question courts are to take a holistic approach to the evidence. *See Ortiz*, 834 F.3d at 766 (stating that "all evidence belongs in a single pile and must be evaluated as a whole"). Nonetheless, courts may still employ frameworks for "organizing, presenting, and assessing" the evidence before them. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Chief among these is the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McDonnell Douglas* burden-shifting kicks off when the plaintiff makes a *prima facie* showing of discrimination—that "(1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Kuttner v. Zaruba*, 819 F.3d 970, 976 (7th Cir. 2016). With the burden

---

[4] This articulates a "but for" standard of causation. When Congress amended the ADA in 2008, it changed the causal language from "because of" to "on the basis of" and the Seventh Circuit has noted that "it is an open question whether the change from 'because of' to 'on the basis of' changes the 'but for' causation standard." *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 504 (7th Cir. 2017). As in *Monroe*, however, "the parties in this case have not argued that another causation standard should apply, so [the Court] will continue to apply the 'but for' causation standard." *Id.*

shifted, the defendant must respond with a non-discriminatory reason for treating the plaintiff the way it did. If the defendant does so, the evidentiary burden seesaws back to the plaintiff to show that the defendant's explanation was pretextual.

Situated within the post-*Ortiz* landscape, *McDonnell Douglas*—or any other framework—outlines a pattern of evidence that might enable a reasonable juror to find discrimination, but it does not replace the underlying question of discrimination. As a result, no framework may operate to the exclusion of other, equally probative patterns of evidence. *David*, 846 F.3d at 224. Where, as here, a litigant uses *McDonnell Douglas*, courts should consider that arrangement of evidence, but they must also conduct a less structured inquiry into whether "the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765.

Considered within the *McDonnell Douglas* framework, Ms. Jenkins' claim does not get off the ground. More specifically, Ms. Jenkins fails to make a *prima facie* case and thereby shift the burden onto CTA because she does not show that she was meeting CTA's legitimate job expectations or that similarly situated employees outside of the protected class received more favorable treatment. As to the first insufficiency, by not wearing proper footwear, Ms. Jenkins failed to meet two of CTA's legitimate expectations: that employees comply with the uniform requirements and that employees are capable of successfully (and safely) completing rail-training. *See, e.g., Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005) ("EGC, as an employer, is certainly entitled to expect its workers, disabled or otherwise, to use care and caution in the workplace and to adhere to factory-wide safety policies and requirements, as well as directives."). The fact that these failures stemmed directly from Ms. Jenkins' disability does not render the decision discriminatory. *See id.* (An employer can terminate an employee for failure to

meet legitimate expectations "even if, after further inquiry, [the] employer determines that the employee's inability to perform the job 'is due entirely to a disability.'" (quoting *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1997))).

As to the second shortcoming, Ms. Jenkins has not identified similarly situated employees who received more favorable treatment. During her termination, Ms. Jenkins requested treatment on par with CTA's bus operators with suspended licenses, DSOF ¶ 31, but the bus operators are not directly comparable because they have different job duties, deal with a different supervisory chain, and engage in different conduct. *See Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 507 (7th Cir. 2017). Ms. Jenkins' failure to identify an alternative set of employees is "sufficient to end the inquiry" because it is Jenkins' "responsibility to identify and present evidence of a comparator at the summary judgment stage." *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015). As a result, Ms. Jenkins' claim cannot survive summary judgment under *McDonnell Douglas*.

Freed from the structure of *McDonnell Douglas*, Ms. Jenkins' claim gets no further. No configuration of the evidence—direct and/or circumstantial—can support a finding that CTA terminated Ms. Jenkins' employment for illegitimate reasons. There is no direct evidence that supports a finding of discrimination: CTA made no "admission that [it] fired [Ms. Jenkins] on the basis of [her] disability." *See Monroe*, 871 F.3d at 504. The little available direct evidence of intent, which comes from Ms. Jenkins' testimony, indicates CTA fired her because she "could not do the job CTA hired [her] to do." Jenkins Dep. 128:13-17, ECF No. 92-2. That leaves circumstantial evidence, which may include:

> (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.

*Monroe*, 871 F.3d at 504 (quoting *Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014)). But nothing points towards a discriminatory motive: the timing was consistent with Ms. Jenkins' failure to complete the training; there is no evidence of suspicious treatment of other employees with disabilities; CTA policy delineates a clear, uniform rule—failure to complete Rail Safety Training "for any reason" results in "separate[ion] from CTA employment," DSOF ¶ 48; and the record provides no reason to believe the proffered justification was pretext. In sum, no reasonable factfinder could conclude that Ms. Jenkins' disability caused the discharge.

## C. Failure to Accommodate

An employer also discriminates on the basis of disability when it fails to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).[5] A qualified individual is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C § 12111(8).

CTA argues that it had no duty to accommodate because Ms. Jenkins did not request accommodation until it was too late—at the time she made her requests, she had already been administratively separated. This argument proves too much. The ADA limits the obligation to "known" disabilities, but the employer's knowledge need not come through a formal request. Here,

---

[5] If the Court had found that, although not actually impaired, Ms. Jenkins had a disability under the "regarded as" subsection, the failure to accommodate claim would be unavailable. *See Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013) ("The amendments to the ADA clarified that employers needn't provide reasonable accommodation to a 'regarded as' disabled individual. 42 U.S.C. § 12201(h).").

while Ms. Jenkins did not explicitly inform CTA of her disability or request an accommodation, her CAM boot made CTA "sufficiently aware" that she "may have a disability that requires accommodation." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005). Indeed, the clear relationship between Ms. Jenkins' inability to perform her job and her impairment led to CTA's instruction that she visit the doctor to determine the extent of the impairment. DSOF ¶ 35. Of course, employers are not obligated to assume all work problems arise from latent or undisclosed disabilities. In *Tate v. Ancell*, for example, the Seventh Circuit found that the employer was not on notice of an employee's sleep apnea—and therefore had no duty to accommodate— when he was disciplined for "sleeping on the job." 551 F. App'x 877, 886 (7th Cir. 2014). And courts must not encourage claims based on concealment, where "the employee keep[s] his disability a secret and sue[s] later for failure to accommodate." *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996). But where the performance issue is self-evidently intertwined with a disability and there is no evidence of bad-faith, non-verbal notice can suffice. Importantly, this rule discourages defenses based on manufactured ignorance, the employer's equivalent of concealment. *See Sears, Roebuck & Co.*, 417 F.3d at 804 ("[A]n employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark."). Viewing the evidence in the light most favorable to Ms. Jenkins, a reasonable jury could conclude that she had a "known" disability when she was terminated by CTA.

Awareness of a disability triggers the obligation to "initiate an informal, interactive process" to identify "potential reasonable accommodations." 29 C.F.R. § 1630.2(o)(3). A failure to engage in the required interactive process, however, "is not an independent basis for liability under the ADA." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014). Rather,

15

the failure "need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation"—in other words, whether she was a qualified individual. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013). Ms. Jenkins has identified three potential accommodations: leave from work to allow her foot to heal, reassignment to a different position, or temporary participation in a light-duty position.

Before assessing the reasonableness of Ms. Jenkins' requested accommodations, the Court considers whether CTA genuinely offered Ms. Jenkins the temporary resignation accommodation she later requested. It is undisputed that Ms. Giagnoni **told** Ms. Jenkins that she could resign and that once she had a doctor's release, she would be placed in the next available training. DSOF ¶ 51. It is also undisputed that Ms. Jenkins rejected this accommodation when it was initially offered. *Id.* ¶ 52. If that accommodation was genuinely on the table, it would have satisfied CTA's obligation under the ADA and Ms. Jenkins' claim would fail. *See Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 682 (7th Cir. 2010) ("By rejecting the proposed accommodations, she was responsible for terminating the interactive process and hence not entitled to relief under the ADA."). CTA muddies the water, however, by arguing that Ms. Jenkins' "employment at CTA would have been at an end regardless of her refusal to sign resignation papers." Def.'s Mem. at 14, ECF No. 91. It is not evident—though it is possible—that CTA's phrasing includes the above resign-and-rehire scheme. Further, CTA does not argue that the offer satisfied its obligations under the ADA. Instead, CTA argues that Ms. Jenkins has failed to identify a reasonable accommodation; therefore, the Court accepts CTA's framing and turns to this argument.

Reasonable accommodations are "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable [a qualified] individual with a disability . . . to perform the essential functions of that position[.]" *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) (alterations in original) (quoting 29 C.F.R. § 1630.2(o)(1)(ii)). Whether a requested accommodation is reasonable is "a highly fact-specific inquiry and requires balancing the needs of the parties." *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 594 (7th Cir. 2018) (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)).

Ms. Jenkins' first suggested accommodation—extended leave from work to allow her fractured toe to heal—is not a reasonable one under the ADA. The Seventh Circuit recently found that long-term leave from work generally does not qualify as a reasonable accommodation—the term is "expressly limited to those measures that will enable the employee to work." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017). The court reasoned that because the ADA is "an antidiscrimination statute, not a medical-leave entitlement," "[a]n employee who needs long-term medical leave cannot work and thus is not a 'qualified individual' under the ADA." *Id.* Not all absence from work falls outside of the ADA's reasonable accommodation scheme: "[i]ntermittent time off or a short leave of absence—say, a couple of days or even a couple of weeks—may, in appropriate circumstances, be analogous to a part-time or modified work schedule," two accommodations contemplated by the statute. *Id.* at 481. *See also Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 601 (7th Cir. 1998) (finding request for leave of two to four weeks reasonable). Given that Doctor Primus instructed Ms. Jenkins to wear the boot for six to eight weeks, she would not have been able to complete rail training or attend work in compliance

with CTA's uniform policy for that amount of time. Even assuming the relevant period was only six weeks, that constitutes long-term leave under the framework articulated in *Severson*.[6]

Further, the record cannot support a finding that, contrary to the general rule, extended leave was reasonable in this circumstance. Ms. Jenkins provides no evidence that her role with CTA was one of "a few possible exceptions" to the rule that attendance is an essential function. *See Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 490 n.47 (7th Cir. 2014) (noting that regular presence at the job site is an essential function of most jobs but allowing for "a few possible exceptions to this rule"). Indeed, attendance is plainly necessary for the Customer Service Assistant position that Ms. Jenkins briefly held. *See* DSOF Ex. 8, ECF No. 92-2. Nor has Ms. Jenkins provided any evidence that her absence was not "excessive" in relation to her job responsibilities. *See Haschmann*, 151 F.3d at 602. Rather, context indicates the opposite: Ms. Jenkins sought an extended absence very early in her tenure with CTA, even prior to successful completion of preliminary job requirements. In sum, the leave sought by Ms. Jenkins was not a reasonable accommodation under the ADA.

The other two proposed accommodations would have required transferring Ms. Jenkins to a different position—either permanently or temporarily. As to permanent relocation, it is well-established that "the ADA may require an employer to reassign a disabled employee to a different position as reasonable accommodation where the employee can no longer perform the essential

---

[6] Note that inferences that strengthen Ms. Jenkins claim to be a qualified individual—for example, that Ms. Jenkins had a shorter duration of impairment or a greater ability to walk without the CAM boot—weaken her claim to have a disability. Even supposing, contrary to the findings of the Court, that a reasonable factfinder could deem either requirement satisfied, it would be even more unreasonable for any single factfinder to conclude that both were satisfied. Because both classifications are threshold requirements for an ADA discrimination claim, the antagonism provides further support for the conclusion that Ms. Jenkins' claims cannot survive summary judgment.

functions of their current position." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 291 (7th Cir. 2015) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir. 1996)). The employer's reassignment obligation, however, is "limited to vacant positions," *Id.*, and it is the employee's "burden to prove that there were, in fact, vacant positions available at the time of [her] termination." *Severson*, 872 F.3d at 482. Here, Ms. Jenkins has put forth no evidence of contemporaneous vacancies; therefore, no reasonable factfinder could conclude that this accommodation was reasonably available to CTA.

Ms. Jenkins also requested a temporary reassignment. Again, Ms. Jenkins has not identified any vacant temporary or light duty positions that she could have filled. As above, "an employer need not create a light duty position for a non-occupationally injured employee with a disability as a reasonable accommodation." *Id.* (quoting EEOC Enforcement Guidance: Workers' Compensation & the ADA, 2 EEOC Compliance Manual (CCH) ¶ 6905, at 5394 (Sept. 3, 1996), 1996 WL 33161342, at *12). If, however, the "employer has a policy of creating light-duty positions for employees who are occupationally injured, then that same benefit ordinarily must be extended to an employee with a disability who is not occupationally injured unless the company can show undue hardship." *Id.* at 482. But Ms. Jenkins does not argue, and record does not indicate, that CTA had such a program.

In her termination hearing, Ms. Jenkins did identify a different sort of temporary work program, requesting that she be treated "like a CTA bus driver with a suspended license." DSOF ¶ 31. Ms. Jenkins is correct that CTA maintains a program that provides temporary, non-driving employment for select CTA employees—namely, members of certain unions whose essential function includes driving. DSOF Ex. 14, ECF No. 92-2. Ms. Jenkins does not fall into this category, however, and "[n]othing in the ADA requires an employer to abandon its legitimate,

nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers." *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998).

In sum, no reasonable factfinder could conclude that Ms. Jenkins was a "qualified individual" and, therefore, her claim fails.

## II. Retaliation

To establish a retaliation claim, Ms. Jenkins must show that she engaged in a protected activity, suffered an adverse action, and that the activity caused the adverse action. *Dickerson v. Bd. of Trs.*, 657 F.3d 595, 601 (7th Cir. 2011). The relevant protected activity is Ms. Jenkins' refusal to resign. The question of whether CTA's proposal—that Ms. Jenkins temporarily resign and re-enter training after she healed—was genuinely on offer is also relevant to her retaliation claim. Contrary to the discrimination claim, however, Ms. Jenkins' retaliation claim is strengthened by assuming that the offer was genuine. If it was not—if CTA planned to terminate Ms. Jenkins regardless of her response—there is no possible causal relationship between Ms. Jenkins' potentially protected activity and her termination. To allow for a possible causal relationship, the Court assumes, for the purposes of summary judgment, that CTA intended to honor the offer.

Nonetheless, Ms. Jenkins' retaliation claim fails for a separate reason: her bare refusal to resign cannot reasonably be interpreted as protected activity. To qualify as protected activity, an employee must communicate that they are opposing discrimination prohibited by the relevant statute. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663-64 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."); *Miller v. Am. Fam. Mut. Ins.*, 203 F.3d 997, 1008 (7th Cir. 2000) (finding no protected activity where

plaintiff's complaint "concerned a general displeasure with being paid less than her co-workers given her longer tenure and the fact that she had trained some of them . . ." and not discrimination related to a protected class). The facts under review make clear that Ms. Jenkins "refused to sign the resignation papers," but they don't indicate why. DSOF ¶ 52. Even if Ms. Jenkins refused to resign ***because*** she perceived disability discrimination, her reasons for refusal are irrelevant unless they were communicated to CTA. *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997) ("Gleason claims in her deposition testimony that she '***feels***' that Novak's objectionable behavior 'encompassed . . . sexual discrimination,' but unless she made these 'feelings' known to her employer, they are irrelevant." (alteration in original)); *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727-28 (7th Cir. 2003) ("Although an employee need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, 'she has to at least say something to indicate her [gender] is an issue. An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.'" (alteration in original) (quoting *Miller*, 203 F.3d at 1008)). Because there is no evidence that Ms. Jenkins expressed her refusal in terms implicating disability discrimination, her behavior was not protected under the ADA.

* * * * *

For the reasons stated above, CTA's motion for summary judgment is granted.

Date: February 20, 2020

John J. Tharp, Jr.
United States District Judge